The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence. Upon reconsideration of the evidence, the undersigned reach different facts and conclusions from those reached by the Deputy Commissioner and accordingly, the February 16, 1995, Opinion and Award by the Deputy Commissioner is HEREBY REVERSED. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate award.
Accordingly, the Full Commission find as fact and conclude as matters of law the following, which were entered into by the parties as
STIPULATIONS
1. The parties are subject to and bound by the provisions of the Workers' Compensation Act.
2. The employer-employee relationship existed between the defendant and plaintiff.
3. Travelers Insurance Company was the compensation carrier on the risk.
4. Plaintiff's average weekly wage was $359.20.
5. The dates of the alleged injuries are April 6, 1993, and September 25, 1992.
The parties also stipulated to all of the relevant medical records.
Based upon the competent, credible, and convincing evidence of record, the undersigned make the following additional
FINDINGS OF FACT
1. Plaintiff, who was fifty-five years old as of the date of initial hearing and who had completed the third grade, was employed by defendant-employer and its predecessor, Buncombe County Sewage, for fourteen and one-half years. Plaintiff had several injuries involving both his left and right wrists prior to September of 1992.
2. As a laborer for defendant-employer, plaintiff's primary jobs were of "Call Truck Operator" and "Flush Truck Operator". The Call truck investigated sewer complaints and required plaintiff to respond to overflow and water stoppage calls. He would utilize hand-held equipment in an effort to alleviate the problems. The use of this equipment was not extremely strenuous compared to the duties he performed when assigned to the Flush Truck.
3. Plaintiff's job as a Flush Truck Operator required him to clean out sewage lines on a regular basis. This job required the use of motorized, pressurized 3-4 inch hoses which were fed into sewer lines with a motor attached to the front of the flush truck. One operator would control the motor which fed the hose into the sewer lines. The other operator manually directed the end of the hose as it entered the sewer. Water was then forced through the hose at pressures of 200 to 3500 pounds, in an effort to clean out the lines. At various times during this operation, which were completely unpredictable, the hose would become stuck or entangled in the sewer lines. At those times, the operator of the motorized control at the front of the truck would attempt to loosen the hose utilizing the motor operator to unstick the hose. Because of the nature of this operation, the operator at the entrance to the sewer who manually grasps the hose must exert considerable strength in an effort to loosen the hose, and can never predict the amount of force necessary to unstick the hose. During any given day, the hose may get stuck up to one dozen times.
4. Plaintiff's usual job was that of a Call Truck Operator. However, due to differing work loads and absenteeism, plaintiff would from time to time be assigned to the Flush Truck. According to plaintiff's supervisor, Mr. John Fields, plaintiff was not usually assigned to the Flush Truck and was never assigned more than a few times per year.
5. On September 25, 1992, plaintiff was assigned to the Flush Truck. He responded to a call to unstop an overflowing manhole. The two inch water hose was inserted into the sewer line as was usually done. However, the hose became caught or entangled and could not be extricated utilizing the motor on the front of the truck. At that point and time, the plaintiff grasped the hose with both hands and "snatched" really hard and immediately felt a sharp pain which radiated up his right arm. Due to the severity of the pain, plaintiff could not continue to work.
6. Upon returning to the employer's office, plaintiff immediately reported the incident of the snatching of the hose and the pain in his right wrist to his supervisor, Mr. John Fields. Such reporting was corroborated by Mr. Fields in his testimony. Defendants filed a Form 19 with the Industrial Commission dated December 8, 1992, which reported the September 25th incident.
7. Plaintiff was thereafter seen by Dr. Allen Bumgardner on September 28, 1992, with complaints of right wrist pain from overuse at work. Dr. Bumgardner noted some inflammation, decreased range of motion, and tenderness in the right wrist.
8. After the incident of September 25, 1992, plaintiff's wrist pain began to progressively worsen. Plaintiff complained of decreased grip strength and almost constant pain. Plaintiff reported decreased function in his hand including decreased ability to lift, decrease in length of use due to fatigue, and pain, and swelling.
9. Thereafter, plaintiff returned to work for the defendants in December of 1992, returning to his primary job as a Call Truck Operator.
10. On April 6, 1993, plaintiff was again assigned to the job as a Flush Truck Operator cleaning out sewer lines. Sometime before lunch, the hose again became stuck and entangled, at which time the motor was not able to loosen it. At that point, plaintiff again grasped the hose with both hands, resting his feet against the edges of the manhole for support, leaned his weight back and jerked hard on the hose. Plaintiff felt immediate pain shooting up his left arm and into his left bicep. Plaintiff continued to work for approximately five minutes and thereafter had to stop due to a throbbing pain and swelling in his left wrist. Due to the pain and swelling, plaintiff thereafter switched jobs and operated the motor on front of the truck.
11. Later in the same day, plaintiff was using a shovel or metal bar to dig with in performance of some additional duties. Use of the shovel and bar continued to make plaintiff's pain worse. Upon returning to the employer's work office, plaintiff again reported the incident of jerking the hose and digging with the shovel and bar to his supervisor, Mr. John Fields. Plaintiff's testimony is corroborated by that of Mr. Fields as to the immediate reporting on the same day the injury occurred.
12. Plaintiff was thereafter seen the following day by Dr. Alan Bumgardner with reports of left wrist pain. Dr. Bumgardner stated "he was pounding on a pipe yesterday with a metal pole and is now having pain and swelling in his left wrist." On examination, Dr. Bumgardner noted swelling at the base of the left wrist and placed plaintiff in a wrist splint.
13. Plaintiff thereafter continued to work for defendant-employer on light duty activities including a Flagman position although such jobs were felt by plaintiff to be too taxing because of increased pain and disability in his hands.
14. Plaintiff continued work until he was evaluated by Dr. E. Brown Crosby at the Asheville Hand Center on June 17, 1993. Such evaluation was at the request of defendant-employer. Dr. Crosby initially reported plaintiff's loss of time was directly related to his on-the-job injury of 1986. However, in his deposition testimony, Dr. Crosby admitted he was not provided information regarding the incident of September 25, 1992, or April 6, 1993.
15. Based upon Dr. Crosby's testimony, it can be sufficiently determined that the two above-mentioned compensable incidents helped to accelerate plaintiff's underlying wrist problems to the extent that they probably contributed significantly to his subsequent total disability from gainful employment. Plaintiff has thus been totally disabled according to the credible and convincing medical testimony since June 17, 1993.
16. Plaintiff was not seen for complaints of right or left wrist pain during the period of January 29, 1991, through October 5, 1992. Similarly, the first notation of wrist pain in the notes of Dr. Bumgardner are September 28, 1992.
17. Dr. Crosby, when asked regarding the significance of the decreased frequency of visits prior to September 1992, stated:
"He certainly has been seeing me less frequently. You have factors such as his age, his continuing to be — the aging process, etc., the cumulative work situation in general, but certainly if this major trauma did occur in September of 1992, then that would help explain the rather significant deterioration in his ability to work." (Crosby, depo. p. 16-17.)
18. Dr. Crosby expressed the opinion that plaintiff sustained a 20 percent permanent partial disability to each hand, but was unable to specify which portion was due to any underlying arthritic condition and what portion was related to the work-related incidents.
19. Dr. Crosby thereafter referred plaintiff to Dr. Kate Queen, a board-certified rheumatologist, for evaluation. Dr. Queen's tests were inconclusive, and she was not able to make a diagnosis of arthritis.
20. The injuries plaintiff sustained to his right and left wrists on September 22, 1992 and April 6, 1993 were caused by interruptions of plaintiff's regular work routine and the introduction of unusual conditions likely to result in unexpected consequences. Plaintiff's testimony regarding how and when these certain incidents occurred is accepted as credible and convincing.
21. Plaintiff's average weekly wage was $359.20, yielding a compensation rate of $239.47.
* * * * * * * * * *
The foregoing stipulations and findings of fact engender the following
CONCLUSIONS OF LAW
1. On September 25, 1992, and again on April 6, 1993, plaintiff suffered compensable accidents arising out of and in the course of his employment with defendant-employer. G.S. 97-2 (6).
2. As a result of these compensable injuries, plaintiff was rendered temporarily totally disabled as of June 17, 1993, and is entitled to compensation benefits as such.
3. Plaintiff's counsel is entitled to a reasonable attorney's fee of twenty-five percent of amounts already accrued and of every fourth check thereafter.
4. Plaintiff is entitled to any and all medical treatment related to his compensable injuries as may reasonably be required to effect a cure, give relief, or lessen plaintiff's disability once bills for the same have been submitted through the carrier to the Industrial Commission for approval.
* * * * * * * * * *
The foregoing stipulations, findings of fact, and conclusions of law engender the following
AWARD
1. Defendants shall pay plaintiff continuing temporary total disability compensation from June 17, 1993 and continuing until such time as plaintiff returns to work or such time as defendants obtain approval of the Commission to stop payments. Those sums which have accrued shall be paid in lump sum without commutation.
2. Defendants shall pay plaintiff's counsel one-fourth of accrued sums as a reasonable attorney's fee for services rendered. Thereafter, defendants shall pay every fourth check directly to plaintiff's counsel.
3. Defendants shall pay all compensable medical expenses once bills for the same have been submitted through the carrier and approved by the Commission.
4. Defendants shall pay the costs.
The case is HEREBY REMOVED from the Full Commission hearing docket.
This the ___________ day of _________________________, 1995
 S/ _________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ _________________ THOMAS J. BOLCH COMMISSIONER
S/ ____________________ BERNADINE S. BALLANCE COMMISSIONER
JHB/nwm